UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Patricia Peterson,                                                                    Civil No. 04-4235 (PAM/RLE)

                        Plaintiff,

v.                                                                                              **MEMORANDUM AND ORDER**

One Call Concepts, Inc.,

                        Defendant.

---

       This matter is before the Court on Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion is granted.

**BACKGROUND**

       Plaintiff Patricia Peterson began working at Defendant One Call Concepts, Inc. ("OCC") in 1997. (Coan Aff. Ex. 1 at 10 (Peterson Dep.).) OCC operates a call center that assists homeowners and contractors in locating underground utilities. (Id.) Peterson first began as a customer service operator. (Id. at 11.) In January 1998, Peterson was promoted to training coordinator. (Id. at 12.) In 1999, Peterson received another promotion to administrative assistant. (Id. at 64.) Her primary job duties included processing payroll, managing employee time records, and processing accounts payable. (Id. at 65.)

**A.**     **Plaintiff's Job Performance**

       The majority of Peterson's time was spent processing payroll. Peterson's deadline for payroll processing was on Mondays at 10:00 a.m. (Id.) Peterson concedes that she processed payroll late on more than one occasion, and made errors in payroll processing. (Id. at 102-03.) However, she complains that other managers interfered with her processing system and made

it difficult for her to complete payroll. (Id. at 79-80.)

Beginning in June 2003, Peterson received additional training on payroll processing. Jodi Jones, the administrative assistant from OCC's Kansas office, came to Minnesota to train Peterson. (Id. at 96-104; 107-110.) Jones trained Peterson on new payroll processing methods, instructed Peterson to make new employee files, and trained her on accounts payable. (See id.)

OCC contends that Peterson's performance did not improve following her training in 2003. At an August 2003 managers' meeting, concern was expressed over employee performance and organization at OCC's Minnesota branch. (Coan Aff. Ex. 2 at 23-24 (Holzer Dep.).) In September 2003, Dawn Jester, general manager from the OCC Kansas office, told Peterson that she was upset with the mistakes in Peterson's payroll processing and that the Minnesota branch had more errors than any other locality. (Id. Ex. 1 at 116.) Peterson received the same complaints from other OCC managers. (See id. at 193.)

On Monday, October 6, 2003, at 10:00 a.m., payroll processing was due. Peterson did not complete payroll on time. She complained that she had not received the necessary information from a supervisor until late Sunday night. Peterson's supervisor, Nicole Bradley, obtained the necessary information and gave it to Peterson to complete. Peterson completed payroll processing at 1:00 p.m. and gave it to Bradley. Bradley found numerous mistakes. Payroll was not accurately completed until after 5:00 p.m. and was sent to corporate headquarters after 6:00 p.m. without verification.

Following the October 6, 2003, untimely payroll submission, Bradley contacted OCC

Vice President Susan Volkman. Bradley complained to Volkman of Peterson's poor performance and disorganization. Volkman, Bradley, and Jester testified that the decision to terminate Peterson was made on October 6, 2003. (Coan Aff. Ex. 3 at 48 (Jester Dep.); Ex. 4 at 31-32 (Bradley Dep.); Ex. 5 at 121-23 (Volkman Dep.).)

On October 7, 2003, when Peterson arrived at work, Bradley approached her about finding the documents necessary to verify the payroll completed on October 6, 2003. (Id. Ex. 4 at 47-48.) Peterson told Bradley she would locate the documents, but she never did. (Id. at 49.) At some point that morning, Bradley and Tammy Craigie, one of Peterson's supervisors, noticed that Peterson was boxing up some items in her office. Peterson told them that she was just packing personal items. There is some dispute as to whether Peterson packed only personal items or also packed company items. Nonetheless, Peterson left OCC around 10:00 a.m. and did not return. (Id. at 54.) However, Peterson called Bradley that afternoon to inform her that she was not quitting her job.

In the evening on October 7, Peterson sent a fax to Volkman, with an attached note from her doctor that informed OCC that she needed ten days paid time for "acute anxiety reaction/stress reaction." (Id. Ex. 1 at Ex. 24.) OCC granted her paid leave in accord with its medical leave policy. From October 7 to December 29, Peterson submitted doctor's notes to excuse her absence. (Id. Exs. 27-32.) Peterson submitted Family Medical Leave Act ("FMLA") paperwork for the first time on December 26, 2003. She informed OCC that she would return to work on December 29, 2003. When she returned on December 29, 2003, OCC terminated Peterson.

**B.     Sexual Harassment**

Peterson contends that she began complaining in June 2003 to Vice President Volkman about sexual harassment at OCC. Specifically, Peterson contends that her co-worker Tonya Bethke and her supervisor Tammy Craigie created a hostile work environment for her.

Peterson asserts that at sometime in her employment, Bethke threw a pen at her, threw a chair, bent her car mirrors, looked through her cell phone, and blocked her from leaving work. Bethke denies all of these claims. Peterson also asserts that if she did not participate socially with Bethke, Bethke would make her "pay for it at work the next day." Regardless, Peterson concedes that she and Bethke maintained a social relationship outside of work.

Peterson also claims that Craigie sexually harassed her. She alleges that Craigie faked asthma attacks, rubbed against Peterson's breasts, giggled, grabbed her, and prohibited her from leaving the office. She also claims that both Craigie and Bethke called her a lesbian. Nevertheless, Peterson maintained a social relationship with Craigie, and maintained a professional and friendly demeanor with Craigie while at work.

Peterson claims that she was retaliated against in violation of the FMLA. She also claims that she was subjected to sexual harassment and retaliated against for reporting such harassment.[1] Defendant brings this Motion on all claims.

**DISCUSSION**

**A.     Standard of Review**

---

[1] At oral argument, Peterson agreed to dismiss Count III of her Complaint.

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in a light most favorable to the non-moving party. The burden of demonstrating that there are no genuine issues of material fact rests on the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

**B.   FMLA Claim**

An employee can prove FMLA retaliation using the burden shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973); see also McBurney v. Stew Hansen's Dodge City, Inc., 398 F.3d 998, 1002 (8th Cir. 2005). Under this paradigm, Peterson must first establish a prima facie case: (1) she exercised her rights under the FMLA; (2) she suffered an adverse employment action; and (3) there was a causal connection between her exercise of rights and adverse employment action. McBurney, 398 F.3d at 1002. Causation requires the employee to show that the employer's "retaliatory motive played a part in the adverse employment action." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (internal quotation omitted).

OCC first contends that it is not liable as a matter of law because the decision to terminate Peterson occurred prior to her request for FMLA leave. Indeed, Peterson's supervisors testified that they made the decision to terminate her on October 6, 2003, before Peterson even mentioned medical leave. However, OCC did not communicate the termination

5

decision to Peterson until she returned to work on December 29, 2003. Although the relevant inquiry focuses on when the decision was actually made rather than when the effect of the decision occurred, case law reveals that the decision must be made and communicated to Peterson. See, e.g., Regan v. Natural Resources Group, Inc., 345 F. Supp. 2d 1000, 1011 (D. Minn. 2004) (Magnuson, J.); see also Curby v. Solutia, Inc., 351 F.3d 868, 873 (8th Cir. 2003) (discussing that limitations period begins to run only after decision was made and communicated to plaintiff).

Assuming that the termination decision occurred on December 29, 2003, Peterson's prima facie case fails. Peterson argues that the temporal connection between her return to work on December 29 and her termination that same day are sufficient to demonstrate causation. "Generally, more than temporal connection between the protected conduct and the adverse employment action is required" to create an issue of fact on retaliation. Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). Although evidence of temporal proximity between a protected activity and an adverse action may evidence causal connection, evidence that an employer was concerned about a problem before the employee participated in the protected activity weakens the temporal argument. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002). The evidence undisputably indicates that Peterson was not meeting OCC's performance expectations prior to her leave in October 2003, and absent additional evidence, is insufficient.

Moreover, "temporal proximity is generally measured between the request for, or beginning of, FMLA leave and the adverse employment action." Krueger v. Speedway

6

SuperAmerica, LLC, Slip Op. No. 03-6568, 2005 WL 1475368 at *3 (D. Minn. June 22, 2005) (Doty, J.) (although employee was terminated five days after return from FMLA leave, six weeks of time passed between employee's request for FMLA leave and employee's termination, precluding causal connection on temporal basis); see also Strate v. Midwest Bankcentre, Inc., 398 F.3d 1011, 1020 (8th Cir. 2005) ("It follows that close temporal proximity between an employer's discovery of a protected characteristic and an adverse employment action may, on rare occasions, suffice to create an inference of discrimination."); see also Smith, 302 F.3d at 832 (temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be very close, and two weeks between employee's family leave and termination "barely" established causation); St. Hilaire v. Minco Prods., Inc., 288 F. Supp. 2d 999, 1009 (D. Minn. 2003) (Kyle, J.) (eight months between request for FMLA leave and actual termination "too great to raise an inference of retaliation," even though employee was terminated four days after FMLA leave expired). Indeed, three months passed between the time that Peterson requested leave and her termination, and under the standards articulated in the Eighth Circuit, is insufficient to establish causation. Thus, summary judgment is appropriate.

    2.    Pretext

Even assuming that Peterson makes a prima facie showing, her FMLA claim nevertheless fails. OCC articulates that Peterson's termination was strictly related to her poor job performance, and that had she not requested leave, she would have been terminated on October 7, 2003. Under the tripartite McDonnell Douglas scheme, the burden shifts to

7

Peterson to set forth sufficient facts demonstrating that OCC's proffered reason is pretextual. Smith, 302 F.3d at 833. She must also demonstrate that the facts support an inference of retaliation. Id. Peterson simply presents no facts, other than temporal proximity, to suggest that OCC retaliated against her for taking FMLA leave. Moreover, the record reveals that OCC was concerned with Peterson's performance long before her termination on December 29, 2003. Three supervisory employees testified that they made the decision to terminate Peterson on October 6 and that a termination letter was drafted shortly thereafter. The evidence shows that various supervisors and fellow employees were unsatisfied with her job performance, that she knew about and admitted to her performance deficiencies, and despite efforts by OCC management to assist her with her job performance, she still failed to perform adequately. Peterson sets forth no evidence indicating that OCC bore any ill-will towards her because she requested FMLA leave or that she was discouraged from taking such leave. To the contrary, OCC expressly granted Peterson such leave. Accordingly, the Court finds that Peterson fails to create a fact question on pretext and fails to raise an inference of retaliatory motive. Summary judgment is appropriate.

**C.    Sexual Harassment**

Peterson claims that she was sexually harassed throughout her employment and retaliated against for reporting such behavior.[2]

---

[2] Peterson's Complaint plainly alleges sexual harassment claims under Minnesota state law. Even if Peterson's claims were brought pursuant to Title VII, the Court questions whether Peterson exhausted her administrative remedies by filing a charge with the Equal Employment Opportunity Commission ("EEOC") or the Minnesota Department of Human Rights

1.     Hostile Work Environment

Under the Minnesota Human Rights Act ("MHRA"), hostile work environment claims are evaluated under the burden shifting framework articulated in McDonnell Douglas. See Klink v. Ramsey County by Zacharias, 397 N.W. 2d 894, 900 (Minn. Ct. App. 1986) (abrogated on other grounds by Cummings v. Koehnen, 568 N.W.2d 418, 420 n.2 (Minn. 1997)). Peterson must establish a prima facie case: (1) she is part of a protected group; (2) she is subjected to unwelcome sexual harassment; (3) the harassment is based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) OCC knew or should have known of the harassment and failed to take remedial action. See id.; see also Minn. Stat. § 363A.03 subd. 43.

a.    Statute of Limitations

OCC first argues that the statute of limitations bars Peterson's sexual harassment claim. The MHRA imposes a one-year statute of limitations on sexual harassment claims. Minn. Stat. § 363A.29. However, the continuing violation doctrine acts as an exception to this statute of limitations to impose liability on an employer "for a series of related acts of sexual harassment if the unlawful employment practice manifests itself over time." Costilla v. State, 571 N.W.2d 587, 593 (Minn. Ct. App. 1997) (internal quotations omitted). In order for this doctrine to apply, Peterson must show that at least one incident of sexual harassment occurred

---

("MDHR") prior to filing this suit. Regardless, a sexual harassment claim under the Minnesota Human Rights Act does not require a party to file a charge with the MDHR before bringing suit. Minn. Stat. § 363A.33 subd. 1(a).

within the limitations period. See id.

Peterson contends that both Bethke and Craigie sexually harassed her, and that despite her complaints to management, the harassment did not stop. Peterson filed this lawsuit on September 7, 2004, so she must demonstrate that at least one incident of sexual harassment occurred after September 7, 2003. Bethke went on maternity leave in June 2003 and did not return to employment at OCC during Peterson's tenure. Thus, it is inconceivable that any act of harassment by Bethke occurred during the limitations period. Peterson complains, in the absence of any temporal relativity whatsoever, that Craigie rubbed against her breasts, called her a lesbian, sat too close to her, called her at all hours of the night, and faked asthma attacks.[3] However, Peterson fails to set forth any evidence to indicate that any of these alleged incidents occurred during the limitations period. It is not the obligation of the Court to sift through the record to locate evidence to support the parties' arguments. See Northwestern Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662-63 (7th Cir. 1994) (Easterbrook, J.) ("District judges are not archaeologists."); United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs"); Nicholas Acoustics & Specialty Co. v. H & M Constr. Co., Inc., 695 F.2d 839, 846-47 (5th Cir. 1983) ("Judges are not ferrets!"). Accordingly, the Court finds that Peterson fails to sustain her burden to demonstrate that she was subjected to any harassment within the limitations period, and

---

[3] Peterson appears to rely on facts of alleged harassment against another employee at OCC. However, in order for Peterson to bring a claim, she must demonstrate that she was subjected to unwelcome harassment.

therefore summary judgment is appropriate.

        b.      Merits

Even assuming that Peterson's hostile work environment claim is not barred by the statute of limitations, it nevertheless fails on the merits. The unwelcome sexual conduct of which Peterson complains "must consist of sexual advances, requests for favors, sexually motivated physical contact or other verbal or physical conduct or communication of a sexual nature, and it must be sufficiently pervasive so as to substantially interfere with the plaintiff's employment or to create a hostile, intimidating or offensive work environment." Cummings v. Koehnen, 568 N.W.2d 418, 424 (Minn. 1997) (citing Minn. Stat. § 363A.03A subd. 43) (internal quotations omitted). To evaluate the effect of the harasser's language and conduct, the Court may evaluate the nature, frequency, intensity, location, context, duration, and object or target of the harassment. See, e.g., Klink, 397 N.W.2d at 901. Peterson complains that Craigie touched her breasts, called her a lesbian, and otherwise made her feel uncomfortable. However, despite this activity, Peterson maintained a friendly and professional relationship with Craigie, which clearly undermines the subjectively severe or pervasive nature of the conduct. Peterson provides no evidence whatsoever that such conduct was objectively severe or pervasive, as the purported harassment occurred a couple of times, over three or four years, in short duration, and failed to affect her employment. Moreover, Peterson does not complain that such harassment interfered with her employment. At most, Peterson complains that her co-workers' late payroll submissions impeded her job performance. In light of the totality of the circumstances, and even assuming the statute of limitations does not bar her claim, the

Court finds that Peterson fails to create a genuine issue of fact on her hostile work environment claim.

2. Retaliation

Peterson claims that she was retaliated against for reporting sexual harassment. The MHRA also protects against retaliation, and such claims are likewise analyzed under McDonnell Douglas. Peterson must demonstrate that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. See Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101 (Minn. 1999).

On December 29, 2003, around noon, Peterson sent an email to Volkman. (Satre Aff. Ex. 17 at 46 (Volkman Dep.).) Although this email is not included in the record, Volkman testified that it contained allegations of sexual harassment. (Id.) Peterson was allegedly informed of her termination at 1:00 p.m. (Id.) Thus, Peterson claims that there is a sufficient causal connection to withstand summary judgment.

First, it is undisputed that the actual decision to terminate Peterson was made on October 6, 2003. Thus, the temporal connection between the actual termination decision and the protected activity is too remote to establish causation. However, even assuming that Peterson establishes a prima facie case, OCC has consistently articulated that Peterson was terminated for her poor performance. Peterson has not set forth any evidence to permit a reasonable jury to infer that OCC possessed a retaliatory motive in the termination decision, nor does she submit any evidence revealing that OCC's articulated reason is a pretext for retaliation. Accordingly, Peterson's retaliation claim fails.

**CONCLUSION**

Peterson fails to demonstrate that an issue of fact remains for trial. Accordingly, based on all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Clerk Doc. No. 19) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 27, 2005

s/ Paul A. Magnuson<br>Paul A. Magnuson<br>United States District Court Judge